STOSH'S I/M and Stoshu Solski, a/k/a Stosh Solski, Appellant,

v.

## FAIRBANKS NORTH STAR BOROUGH and the I/M and Air Pollution Control Commission, Appellee.

No. S–8887.

Supreme Court of Alaska.

Nov. 17, 2000.

---

Richard W. Wright, Richard W. Wright, P.C., Fairbanks, for Appellant.

A. René Broker, Assistant Borough Attorney, Fairbanks, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

Stoshu Solski appeals the Fairbanks North Star Borough Pollution Control Commission's decision to suspend his license to perform vehicle emissions inspections after his unsatisfactory performance on a covert performance audit. Because we conclude that the Pollution Control Commission followed proper procedures in selecting Solski for a covert audit and that the lack of an auditor training program did not render the covert audit defective, we affirm.[1]

## II. FACTS AND PROCEEDINGS

### A. Facts

Stoshu Solski is a certified I/M mechanic[2]

---

1. We also affirm the superior court's award of $1,000 in attorney's fees to Fairbanks North Star Borough for Solski's unsuccessful appeal to that court.

2. Vehicles in the Municipality of Anchorage and the Fairbanks North Star Borough are required to pass a biennial inspection and maintenance (I/M) test conducted by a certified I/M mechanic.

who owns and operates a certified I/M station in the Fairbanks North Star Borough (FNSB). Since 1994, FNSB has, through its Pollution Control Commission (PCC),[3] tested Solski's compliance with I/M program procedures through six covert performance audits,[4] each of which resulted in a notice of violation.

On October 7, 1997 Auditor David Herring of the PCC's I/M Referee Facility sent a covert vehicle to Solski's garage. Solski was not the original target of the test; the vehicle had been scheduled to go to Gene's Chrysler, which was unable to conduct the test as scheduled. Because Herring did not want to lose an opportunity to conduct a covert audit when he had an audit vehicle in the facility, he went through his list of stations and directed the vehicle owner to call three or four other stations in an attempt to get an appointment. The owner eventually obtained an appointment with Solski. FNSB admitted that Herring skipped over stations on its list that had not yet been tested and chose Solski for a covert audit because he was under "heightened scrutiny" as a result of his unsatisfactory performance on five previous covert audits.

Herring prepared the vehicle for testing and supervised the entire audit procedure. To establish a baseline, Herring tested the vehicle two times before the owner drove the car to Stosh's I/M. In the first test, the vehicle passed all portions of the I/M test (function, visual, and tailpipe). Herring then disconnected one end of the oxygen sensor, which was both witnessed by the vehicle's owner and videotaped. After the disconnec-

tion, Herring retested the vehicle. This time, the vehicle failed because of the disconnected sensor. The failure was due only to the disconnected sensor, not because of dirty emissions.

The owner of the vehicle then brought it to Solski's I/M. Solski tested and passed the vehicle. Even though the oxygen sensor was disconnected, Solski entered a "Pass" on the oxygen portion of the inspection sheet.

After Solski conducted the I/M test, the vehicle's owner returned to the I/M referee facility. Herring then retested the vehicle and failed it once again because of the disconnected oxygen sensor. The following day, PCC issued Solski a notice of violation for failing to detect the disconnected oxygen sensor. Based on Solski's previous record of noncompliance, the PCC also suspended the I/M testing privileges of both Solski and Stosh's I/M for a period of one year.

### B. *Proceedings*

Solski appealed the suspension and notice of violation to I/M Program Administrator Max Lyon, who affirmed the suspension and violation after a hearing. Solski sought review of Lyon's decision before PCC. Following a full hearing, PCC affirmed the violation, but reduced the suspension to six months.

Solski filed a timely appeal of the PCC decision to the superior court, where Judge Mark I. Wood upheld both the violation and the PCC's imposition of the six-month sus-

---

See 18 AAC 52.005(g)(1999). The standards for I/M vehicle testing and certification of I/M mechanics and stations, as well as guidelines for the operation of municipal I/M programs, are specified in the Alaska Administrative Code. *See* 18 AAC 52.005–.400, .500–.550. The terms, conditions, and details of each individual municipal I/M program are left to the discretion of the municipality. *See* AS 46.14.400(g).

3. The PCC is an administrative agency of the FNSB charged with conducting its I/M program. Pursuant to the guidelines provided by the Department of Environmental Conservation (DEC) regulations in the Alaska Administrative Code, PCC creates its own procedures for implementing the I/M program. *See* 18 AAC 52.010, .035.

4. PCC procedures authorize I/M program officials to perform a system of overt and covert tests at sites where certified mechanics perform I/M tests. In a covert vehicle audit, "a vehicle that has been set to fail is taken to a certified I/M station for an official I/M test" without the knowledge of the mechanic or the station. *See* Fairbanks N. Star Borough, FNSB I/M Program Procedures for Covert Vehicle Audits (1994). If the mechanic passes the vehicle, he or she (and possibly the station), will be issued a notice of violation. *Id.* Along with the notice, the mechanic may be subject to a number of disciplinary actions ranging from warning to suspension. *Id.*

pension. Judge Wood subsequently awarded FNSB $1,000 in attorney's fees.

Solski appeals.

## III. STANDARD OF REVIEW

■ We independently review the merits of an administrative determination where the superior court acts as an intermediate court of appeal.[5]

■ In this case, we must determine whether FNSB properly interpreted its procedures governing its covert vehicle audit program and properly exercised its discretion in subjecting Solski to a covert vehicle audit. We review an agency's interpretation of its own regulations under the reasonable and not arbitrary standard.[6] The reasonable and not arbitrary standard is not demanding: "[W]here an agency interprets its own regulation ... a deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation at issue."[7] We review an agency's exercise of its discretionary authority under the reasonable basis standard.[8] Further, "[w]e will not substitute our judgment for that of the agency with respect to the efficacy of a regulation nor review the 'wisdom' of a particular regulation."[9]

■ We review a trial court's award of attorney's fees for an abuse of discretion.[10] We will find that a trial court abused its discretion when, after reviewing the whole record, we are left with a definite and firm conviction that the trial court erred in its ruling.[11]

## IV. DISCUSSION

### A. Solski's Covert Audit Was Proper.

1. *Solski has waived his argument that he followed normal inspection methods.*

■ The PCC suspended Solski from the I/M program because he "failed to correctly perform the oxygen sensor visual inspection as specified in the FNSB I/M Program Mechanics['] Handbook, resulting in the passing of a vehicle documented as a failing vehicle by the FNSB I/M office." In one sentence in his brief, Solski states that he followed "the normal inspection method set out in the mechanic's guide book." He does not elaborate on this matter and offers no evidence to support his claim.

We have long held that "where a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal."[12]

Because Solski has effectively waived the issue of whether he properly performed the oxygen sensor test, we limit our discussion to whether the audit itself was defective.

Solski next argues that his suspension should be vacated because his October 1997 covert audit was unlawful. In support of his claim, he argues that the audit suffered from two specific defects: (1) lack of randomness in his selection and (2) PCC's failure to have properly trained auditors conducting the test.

2. *PCC followed proper procedures in selecting Solski for the covert audit.*

Solski argues that his covert audit was invalid because PCC did not select him randomly as its own regulations require.

---

**5.** See *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992).

**6.** *Id.*

**7.** *Rose v. Commercial Fisheries Entry Comm'n*, 647 P.2d 154, 161 (Alaska 1982).

**8.** *Id.*

**9.** *Anchorage Sch. Dist. v. Hale*, 857 P.2d 1186, 1188–89 (Alaska 1993).

**10.** See *Davila v. Davila*, 908 P.2d 1027, 1031 (Alaska 1995); *McNett v. Alyeska Pipeline Serv. Co.*, 856 P.2d 1165, 1167 (Alaska 1993).

**11.** See *Buster v. Gale*, 866 P.2d 837, 841 n. 9 (Alaska 1994) (quoting *Peter Pan Seafoods, Inc. v. Stepanoff*, 650 P.2d 375, 378–79 (Alaska 1982)).

**12.** See, e.g., *Adamson v. University of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991); *see also Petersen v. Mutual Life Ins. Co.*, 803 P.2d 406, 411 n. 8 (Alaska 1990) (holding that argument was waived where appellant mentioned it in main brief but failed to "advance any legal argument as to why the court erred"); *State v. O'Neill*, 609 P.2d 520, 528 (Alaska 1980) (holding that "[f]ailure to argue a point constitutes abandonment of it").

■ The FNSB I/M Program Procedures for Covert Vehicle Audits sets forth two station and mechanic selection criteria for its covert audit program, random audits and targeted audits:

Covert vehicle audits of all Certified Stations and Certified Mechanics are conducted on a random basis.... *In addition, covert audits are performed on an as-needed basis to investigate reported or suspected cases of Station or Mechanic noncompliance with I/M program procedures.* (Emphasis added.)

Thus, there are two bases for conducting covert audits—random testing and "as-needed" testing where there is a report or suspicion of station or mechanic misconduct. PCC interprets the "as needed" language above to permit additional covert audits on stations that have a history of poor performance on previous covert tests or routine facility audits.

FNSB freely admits that in this case Solski was not randomly chosen. Instead, it places its reliance on the "as-needed" language in its procedures, stating that it chose Solski for a covert audit over other mechanics and stations that had not yet been audited that year because he was under "heightened scrutiny" resulting from his unsatisfactory performance on five previous covert audits.[13] Therefore, the question before this court is not whether Solski was randomly chosen for the audit, but whether FNSB has properly interpreted the "as-needed" language in its procedures.

FNSB finds justification for its position in three provisions in its Program Design Document, which it believes gives it permission to perform covert vehicle audits at its own discretion. Section 3.3 of the Design Document requires the I/M program administrator to enforce the requirements of the I/M program and gives him or her broad discretion to conduct inspections and other performance tests to monitor the performance of the certified stations in the program.[14] Section 3.4 of the Design Document expands upon this definition, stating that the administrator can "investigate" and "gather evidence" of violations both in response to complaints and on his or her "own initiative."[15] The next section in the Design Document explicitly describes the scope of the I/M program administrator's power with respect to covert vehicle audits, clearly stating that the administrator has the power to conduct any covert audits he or she feels are necessary to ensure that program standards are being followed.[16]

---

13. Solski's first covert vehicle audit took place on November 2, 1994; Solski was given a warning for conducting an improper visual inspection and failing to see that the oxygen sensor was disconnected.

Less than two weeks later, on November 14, the PCC conducted a second covert audit of Solski's I/M, based upon a consumer complaint. Solski once again passed a vehicle which should have failed, neglecting to perform a required visual and functional inspection and entering false data onto the inspection form.

In June 1995 the PCC conducted a third covert audit of Solski and issued Solski a 30–day suspension for failing to catch a problem with the air temperature sensor during the visual inspection portion of the test. Solski challenged this suspension in a hearing before the PCC on June 28, 1995. The PCC determined that the suspension was too severe and reduced it to a warning.

On December 20, 1995 the PCC performed a fourth covert audit and gave Solski a 30–day suspension for entering false data and failing to perform a functional test.

Solski was subjected to a fifth covert audit in February 1996, for which he was issued another warning for, among other things, entering the incorrect engine size on the inspection form.

14. *See* Fairbanks N. Star Borough, FNSB BAR–90 I/M Program Design Document § 3.3, at 3–1 (1994). Section 3.3 provides, in relevant part:

The I/M Program Administrator is the representative of the Borough for the purposes of monitoring and enforcing the requirements for Certified I/M Stations. The I/M Office shall routinely conduct inspections of the Certified I/M Stations to ensure that all Program requirements are being met.... The I/M Office may perform other quality control checks and monitoring of performance as the Program Administrator believes necessary.

15. *Id.* § 3.4, at 3–1. Section 3.4 provides, in relevant part:

The Program Administrator shall, on his or her own initiative or in response to complaints, investigate on a continuous basis and gather evidence of violations of the requirements of the I/M Program by any Certified I/M Station or by any employee, partner, officer, or member of a Certified I/M station.

16. *See id.* § 3.5, at 3–2. Section 3.5 provides, in relevant part:

The Program Administrator may conduct such investigations and hearings as he or she believes are necessary to enforce the requirements imposed upon Certified I/M mechanics and Certified I/M Stations under the I/M Program Design.

Additional support for FNSB's position that it is permitted to perform covert vehicle audits on stations and mechanics with a previous history of noncompliance can be found in the DEC regulations, which specifically state that local I/M program personnel have the DEC's permission to perform covert vehicle tests at the local program administrator's discretion.[17]

FNSB's interpretation of the "as-needed" clause in its procedures governing covert test site selection is consistent with the provisions in its Design Document, all of which grant the I/M program administrator great discretion in investigating and enforcing the requirements of the I/M program. It is also consistent with the DEC regulations, which grant local I/M implementing agencies the authority to investigate alleged violations of its I/M regulations "on [their] own initiative," including through covert audits.[18] Since both the DEC regulations and FNSB's other procedures permit the I/M program administrator to perform covert audits on his or her own initiative, DEC's reading of its procedures to permit "heightened scrutiny" of stations and mechanics who have a history of breaking program rules is reasonable and not arbitrary. Under these circumstances, FNSB did not violate its own procedures in choosing to audit Solski. Therefore, we affirm the PCC's determination that Stosh's I/M was properly selected for the covert audit.

> 3. *FNSB's lack of an auditor training program as delineated in its policy document does not make Solski's covert audit defective.*

■ Solski further argues that his covert audit is invalid because FNSB does not train its auditors in the manner described in its policy document entitled "Program Procedures for Auditor Training and Proficiency."[19] FNSB does not contest Solski's assertion that its covert vehicle auditors are not trained in accordance with the scheme set forth in this document. FNSB has also stated that it is not disputing that an auditor training program does not and never has existed.

■ An administrative agency is generally required to follow its own regulations;[20] an agency's compliance with its own regulations is a strong indicator that it proceeded in the manner required by law.[21] However, even assuming that the auditor training program outlined in the "Program Procedures" document is a regulation,[22] there was substantial compliance with its requirements in this case. The goals established by the training pro-

---

Such investigations may include both overt and covert performance audits of Certified Stations and Mechanics by I/M staff or other individuals designated by the Program Administrator.

**17.** 18 AAC 52.105 provides, in relevant part:

(b) The implementing agency shall, on its own initiative, or in its discretion in response to a complaint, investigate an alleged violation of this chapter by a certified mechanic or station or by an employee, partner, officer, or member of a certified station.

. . . .

(d) The implementing agency may use an overt or covert performance review of a certified mechanic or station in an investigation under this section.

**18.** *See id.;* 18 AAC 52.440(a)(1).

**19.** FNSB's Program Procedures for Auditor Training and Proficiency require that its auditors take a formal training course and receive a score greater than eighty percent on a proficiency examination before they can work as a qualified I/M program auditor. As part of this course, trainees are to be taught "how to conduct covert

audits, with emphasis on documentation, implanting defects in vehicles, and use of the I/M program database to build a body of evidence." The course is also intended to cover the legal basis for the I/M program and the "administrative laws and procedures of both the State of Alaska and the Fairbanks North Star Borough pertaining to evidence, licensing, revocation, and suspension of licenses, penalties, and appeals."

**20.** *See U.S. v. RCA Alaska Communications, Inc.,* 597 P.2d 489, 498 (Alaska 1978).

**21.** *See Jager v. State,* 537 P.2d 1100, 1108 (Alaska 1975).

**22.** The definition of "regulation" in the Administrative Procedure Act excludes any rule that relates only to the "internal management" of the agency in question. AS 44.62.640(a)(3). The auditor training guidelines, which are concerned primarily with the type of training FNSB's I/M auditors receive, arguably fall within this internal management exception. Because it is unnecessary to decide this issue, however, we decline to do so here.

gram were achieved, principally including the tester's familiarity with and adherence to PCC procedures and state regulations.

Solski's audit was performed by Herring, a person certified as a referee mechanic, and Herring's actions in implementing the test were consistent with FNSB's covert audit procedures: he tested the referee vehicle to establish a baseline; he made the changes to the vehicle; he properly documented the changes; he retested the vehicle upon its return; and he contacted Solski after its return. In addition, Herring videotaped the change made to the subject vehicle before the covert audit and afterwards. In all these respects, Herring conducted the audit in a way that comported with the standards of the auditor training program.

Solski argues that Herring's decision to disconnect the oxygen sensor was a reflection of his lack of training because it is not the kind of defect one normally sees in a 1991 Jeep. The argument is unpersuasive. First, this was a defect that could easily be observed by a mechanic following the steps for the oxygen sensor visual inspection delineated by FNSB in its Mechanics' Handbook.[23] Inclusion of these steps in the handbook makes clear that the defect was one deemed worthy of checking by the pollution control agency. Moreover, Solski had previously been warned for failure to notice a disconnected oxygen sensor. He was unmistakably on notice that he must test for this precise defect. Finally, detecting that the oxygen sensor had been entirely disconnected was a simple and straightforward test.

Under these circumstances, we hold that even if the "Program Procedures for Auditor Training and Proficiency" constituted regulations under state law (a question that we do not decide here), the purposes of the training program were met because the tester was familiar with and adhered to PCC and state regulations concerning testing. Accordingly, FNSB's lack of an auditor training program as set out in its program document does not render Solski's audit defective.

**B.** *The Superior Court Did Not Err in Awarding Attorney's Fees to FNSB.*

 Solski challenges the superior court's award of attorney's fees to FNSB. We will reverse an attorney's fees award only if the superior court abused its discretion.[24] The record demonstrates that the superior court carefully exercised its discretion here. First, it noted that FNSB was the prevailing party and entitled to an award of attorney's fees. Next, it properly considered the number of hours spent by FNSB, reducing the award because the number of hours FNSB claimed to have spent on its case was disproportionate to its value. Finally, it took into account FNSB's conduct and further reduced the award because it found that FNSB had behaved in a "casual and lax" manner which "invited this litigation." There is no evidence in the record that demonstrates that the superior court's award of $1,000 in attorney's fees to FNSB is an abuse of discretion or inconsistent with the standards set by Appellate Rule 508(e).

## V. CONCLUSION

Because FNSB behaved in accordance with law and properly suspended Solski's license to perform I/M inspections, we AFFIRM the decision of the FNSB Pollution Control Commission. Because the superior court did not abuse its discretion in awarding attorney's fees, we also AFFIRM that award.

---

**23.** *See* Fairbanks N. Star Borough, FNSB BAR–90 I/M Program Mechanics' Handbook § 8, at 8–5 (1994). Section 8 provides, in relevant part:
*Visual Inspections*
*Oxygen ($O_2$) Sensor*—Inspect the $O_2$ sensor to determine if it is "Disconnected". . . . Lightly

tug on the wire at the sensor. If the wire feels "springy" or "give" is felt, check to see if the wire is connected to the sensor.

**24.** *See Davila*, 908 P.2d at 1031.