**REGULATORY COMMISSION OF ALASKA, State of Alaska, and Indicated Taps Carriers, Petitioners/Cross–Respondents,**

v.

**TESORO ALASKA COMPANY and Williams Alaska Petroleum, Inc., Respondents/Cross–Petitioners.**

Nos. S–12352, S–12391.

Supreme Court of Alaska.

March 21, 2008.

---

19. See *Ebertz v. Ebertz,* 113 P.3d 643, 647 (Alaska 2005).

20. *Id.*

21. *Id.* at 648.

22. *See id.* at 647.

Charles E. Cole, Law Offices of Charles E. Cole, Fairbanks, Stephan H. Williams, Law Offices of Stephan H. Williams, Anchorage, for Petitioner/Cross–Respondent Regulatory Commission of Alaska.

Ethan Falatko, Assistant Attorney General, Talis J. Colberg, Attorney General, Juneau, for Petitioner/Cross–Respondent State of Alaska.

Louis R. Veerman, Pamela D. Weiss, Molly C. Brown, Guess & Rudd, P.C., Anchorage, Albert S. Tabor, Jr., John E. Kennedy, Vinson & Elkins LLP, Houston, Texas, for Petitioner/Cross–Respondent BP Pipelines (Alaska) Inc., ConocoPhillips Transportation Alaska, Inc., ExxonMobil Pipeline Company, and Unocal Pipeline Company.

Robin O. Brena, David W. Wensel, Brena, Bell & Clarkson, P.C., Anchorage, for Respondent/Cross–Petitioner Tesoro Alaska Company.

Randolph L. Jones, Jr., Conner & Winters, Tulsa, Oklahoma, for Respondent/Cross–Petitioner Williams Alaska Petroleum, Inc.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

In 2003 Tesoro Alaska Company and Williams Alaska Petroleum, Inc., protested the 1986–1996 rates charged by the owners of the Trans–Alaska Pipeline System. The Regulatory Commission of Alaska denied their protest as untimely. Tesoro and Williams appealed to the superior court, which remanded the case for further proceedings. This court granted a petition for review. We reverse the order of the superior court and direct that the decision of the Regulatory Commission be affirmed.

## II. FACTS AND PROCEEDINGS

The Trans–Alaska Pipeline System (TAPS) began operation in 1977. In 1986, after a prolonged dispute about the rates charged by the owners of TAPS (collectively "the Carriers"), the State of Alaska and the Carriers submitted an Intrastate Settlement Agreement (hereinafter the "Settlement") to the Alaska Public Utilities Commission [1] for approval.[2] The Settlement set rates from the beginning of the pipeline through 1986. With respect to future rates, the Settlement set rate ceilings, but parties would still be able to protest rates prospectively. Under the Settlement, rates and rate ceilings were calculated using a methodology unique to TAPS, called the TAPS Settlement Methodology, or TSM.

The Commission opened Docket P–86–2 in 1986 to consider the Settlement. In Order P–86–2(14) ("Order 14"), the Commission approved the Settlement as to the rates prior to 1986. Order 14 emphasized the fact that the "economically impacted parties ... all of which are knowledgeable and sophisticated

---

1. The Alaska Public Utilities Commission was the predecessor to the Regulatory Commission of Alaska. In this opinion, both entities are referred to as the "Commission."

2. *In re Amerada Hess Pipeline Corp.*, Order P–97–004(151) ("Order 151") at endnote 2, at 5 (Regulatory Comm'n of Alaska Nov. 27, 2002), *available at* http://www.state.ak.us/rca/orders/pipeline/1997/p97004_151.pdf (giving an overview of TAPS rate litigation). The rate litigation before the Commission only concerned rates for intrastate shipments of oil, which constitute less than

ten percent of the oil that goes through the pipeline. *Id.* at 2. The Federal Energy Regulatory Commission ("FERC") regulates the rest of the oil throughput as interstate commerce. *Id.*

There was prolonged federal rate litigation prior to 1986 as well, *id.* at endnote 2, at 3–5, which was resolved when FERC approved an Interstate Settlement Agreement in 1985. The Intrastate Settlement was modeled after the Interstate Settlement and set the same rates and rate ceilings as those for interstate oil shipments.

and have sufficient resources to make their views known to the Commission and, further, have all had notice and an opportunity to be heard, are either silent or actively support the imposition of the settlement rates." As shippers, Tesoro and Williams[3] were among the economically impacted parties who actively supported the Settlement. Since there were no pending objections by economically impacted parties for "periods prior to July 11, 1986," the Commission approved the rates contained in the Settlement for that period only.

One shipper, Petro Star, protested the Settlement rates as of July 11, 1986. Because of this protest, the Commission began the process of determining whether or not the rates after that time were just and reasonable. Order 14 therefore suspended the TAPS rates as of July 11, 1986.[4]

The Commission's investigation of the rates continued until 1991, at which time Petro Star and the Carriers submitted a settlement ("the Petro Star Settlement") to the Commission for approval.[5] The Commission issued P–86–2(41) ("Order 41") in 1993 addressing the Petro Star Settlement and the Intrastate Settlement. Order 41 accepted the Petro Star Settlement.[6] It then found that since Petro Star had settled, there was no longer "an economically impacted party contesting the [Intrastate] settlement." Order 41 noted that 3 Alaska Administrative Code (AAC) 48.090(d)(2) enables the Commission to terminate a proceeding if all of the parties stipulate to such a termination, provided that the Commission did "not find that the public interest requires the proceeding to be continued." The Commission, referring

to its earlier order (Order 14), found that the economically impacted entities, including shippers, should be "deemed ... to be knowledgeable and sophisticated and in possession of sufficient resources to make their views known to the Commission." It also noted that they "had notice and an opportunity to be heard." Since no economically impacted entity was protesting the rates that had been calculated using TSM since Order 14, Order 41 held that "the public interest [did] not require the proceeding to be continued." It therefore accepted the Settlement. Order 41 nonetheless continued the suspension of the rates for 1986–1993 in order to determine "that those filed rates were correctly calculated under TSM."

After Order 41 was issued in 1993, Tesoro and Williams did not file a motion for reconsideration and did not protest that the rates calculated under TSM for 1986–1993 were unjust or unreasonable. Tesoro and Williams[7] also did not protest the rates for 1994, 1995, or 1996.[8] In late 1996, Tesoro protested the rates filed by the carriers for 1997. The Commission promptly suspended the 1997 rates and embarked upon an investigation of whether the rates were just and reasonable. In November 2002 the Commission issued P–97–004(151) ("Order 151"), which held that the rates set by the Carriers from 1997–2000 were not just and reasonable and set new rates that were much lower than those filed by the Carriers. Order 151 also noted that the Carriers' rates through 1997 potentially exceeded their reasonable costs of providing service by up to 9.9 billion dollars.[9]

After issuing Order 151, the Commission finally turned its attention to the question of

---

**3.** At that time Williams was known as MAPCO Alaska Petroleum.

**4.** The Commission noted that it could not sever the Petro Star complaint and approve the Settlement only as to the other shippers, since "treating similarly situated shippers differently raises the spectre of undue discrimination under AS 42.06.380."

**5.** Petro Star was also party to federal and state proceedings challenging the inclusion of costs related to corrosion. Under the terms of the Petro Star Settlement, Petro Star agreed to withdraw from all three proceedings in return for $2,500,000.

**6.** Technically, the Commission accepted the Petro Star Settlement in Order 40. Order 41 contained the "Commission's findings and conclusions regarding that acceptance."

**7.** Tesoro and Williams are collectively referred to as "the Shippers" in this opinion.

**8.** These rates were also suspended solely for the purpose of determining if they were correctly calculated under TSM.

**9.** Order 151 at 8, 42, 131.

whether the rates filed for 1986–1996 were correctly calculated under TSM. It scheduled a prehearing conference in March 2003 "to determine whether any party still believed it necessary to verify TSM calculations and inputs for 1986–1996." A few days before the hearing, Tesoro filed a petition to intervene and a protest of the 1986–1996 rates. Williams moved to intervene shortly thereafter. Tesoro and Williams asked the Commission to adjudicate whether the rates were just and reasonable.[10] The Commission in Order 68 declined to expand the scope of its investigation to look at whether the 1986–1996 rates were just and reasonable and found that the Shippers' petition to intervene was not timely.

The Shippers appealed to the superior court. The court, in an order dated June 7, 2006, remanded the matter for further proceedings and instructed the Commission to determine if it "properly acted in excluding appellants as economically interested parties," and emphasized that it should "consider each year at issue separately." It also held that the Commission should determine the just and reasonable rates for "any years in which the appellants were improperly excluded," and for those years from which the appellants were properly excluded, it "must still determine whether the rates at issue were 'correctly calculated'" under TSM. The Commission, the Carriers, and the State of Alaska filed a petition for review of the superior court order. Williams and Tesoro filed a cross-petition. Both were granted, with instructions for each side to file a single, consolidated brief.[11]

## III. STANDARD OF REVIEW

■ When reviewing an order of a superior court acting as a court of appeal in an administrative agency proceeding, we independently review the agency decision.[12]

Under the Pipeline Act, "final orders of the Commission are subject to judicial review under AS 44.62.560–44.62.570."[13] Alaska Statute 44.62.570(b), which is part of the Administrative Procedures Act, provides that the inquiry

extends to the following questions: (1) whether the agency has proceeded without, or in excess of jurisdiction; (2) whether there was a fair hearing; and (3) whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.

■ In *Jager v. State* we held that "[t]he commission's decision to conduct a rate investigation is similar to the type of decision involving agency expertise in a mixed law and fact setting subject to the reasonable basis standard of review...."[14] "When applying the reasonable basis test, we give deference to the agency's determination so long as it is reasonable, supported by the evidence in the record as a whole, and there is no abuse of discretion."[15]

■ We use our independent judgment in questions involving statutory interpretation.[16] We "review an agency's interpretation of its own regulations under the reasonable and not arbitrary standard.... [This] deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation at issue."[17]

---

10. They made no challenge to the accuracy of the TSM calculations.

11. This opinion refers to the arguments in the petitioner's brief as the Commission's arguments, but it should be noted that the brief actually encompasses the arguments on appeal of the Commission, the Carriers, and the State.

12. *Cook Inlet Pipe Line Co. v. Alaska Pub. Utils. Comm'n*, 836 P.2d 343, 348 (Alaska 1992); *Jager v. State*, 537 P.2d 1100, 1106 (Alaska 1975).

13. AS 42.06.480(a).

14. 537 P.2d at 1107 (citing *Kelly v. Zamarello*, 486 P.2d 906, 916–17 (Alaska 1971)).

15. *Cook Inlet Pipe Line Co.*, 836 P.2d at 348 (quotations omitted).

16. *McMullen v. Bell*, 128 P.3d 186, 190 (Alaska 2006).

17. *Stosh's I/M v. Fairbanks N. Star Borough*, 12 P.3d 1180, 1183 (Alaska 2000) (citation and quotations omitted).

## IV. DISCUSSION

### A. The APUC May Set Rates Based on a Settlement Without Adjudicating Whether or Not the Rates Are Just and Reasonable.

■ The Shippers argue that "once the [Commission] acts to set rates, the Alaska Pipeline Act makes it clear that those rates must be just and reasonable, and they can only be set after an investigation and a hearing." While conceding that the Commission "has the discretion to decide not to investigate rates when there is a reasonable basis for the decision[,]" the Shippers state that "*setting* just and reasonable rates on TAPS is not discretionary—it is mandatory." (Emphasis added.) Thus, according to the Shippers, it may be appropriate for the Commission to refuse to initiate an investigation, but once it does act it must finish the investigation and determine just and reasonable rates. If this were true, then the Commission would not be able accept a settlement between a protesting party and a Carrier once the Commission undertook a rate investigation as a result of a protest. For the reasons explained in the paragraphs that follow we reject the Shippers' position on this issue.

Alaska Statute 42.06.140(a)(2) states that the Commission "*may* investigate upon complaint or its own motion, the rates ... of pipeline carriers." (Emphasis added.) Alaska Statute 42.06.140(a)(3) states that the Commission "*may* make, prescribe, or require just, fair and reasonable rates ... for pipeline carriers." (Emphasis added.) This language indicates that the Commission has the discretion to determine whether or not to investigate rates or set new ones. The use of the term "may" in subsection .140(a)(3) counters the Shippers' argument that the Commission must set—rather than accept based on an agreement—rates that are just and reasonable.

The Shippers point to mandatory language in AS 42.06.370(a), which states that "[a]ll rates demanded or received by a pipeline carrier, or by any two or more pipeline carriers jointly, ... *shall* be just and reasonable." (Emphasis added.) But this language specifies what the Carriers are required to do, not what the Commission is required to do.

Subsections .140(a)(2)-(3) fall under Article 1 of the Alaska Pipeline Act, which is entitled "Powers and Duties of Regulatory Commission of Alaska." Thus, the language indicating that the Commission has discretion is found in the part of the Act outlining what powers and duties the Commission has. Subsection .370(a) is part of Article 4 of the Pipeline Act, which is entitled "Rates and Rate Schedules." The use of the word "shall" in subsection .370(a) does not mean that the Commission must investigate each and every rate filed by a carrier. Instead, it sets forth the relevant standard for rates.

The Shippers also point to the following language in AS 42.06.410(a):

> When the commission, after an investigation and hearing, finds that a rate demanded, observed, charged, or collected by a pipeline carrier for a service ... is unjust, unreasonable, unduly discriminatory or preferential, the commission *shall* determine a just and reasonable rate, classification, rule, regulation, practice, or contract to be observed or allowed and *shall* establish it by order.

(Emphasis added.) The Shippers argue that this provision means that once the Commission initiates an investigation, it then has to complete the investigation and set just and reasonable rates. The text of the statute does not support this interpretation. Subsection .410(a) requires the Commission to set just and reasonable rates if "after an investigation and hearing, [it] finds a rate ... is unjust [or] unreasonable." The language therefore indicates that subsection .410(a)'s requirement to set just and reasonable rates only comes into play after the Commission has completed an investigation and found a rate to be unjust or unreasonable. There is nothing in this language that requires the Commission to complete every investigation it initiates or suggests that the Commission lacks the statutory authority to accept settlements once it has started investigating a protest.

The Shippers note that Order 151, which dealt with the 1997–2000 rates, found that the 1986–1996 rates were excessive. The Shippers suggest that this means that the

Commission has already found the rates to be unjust and unreasonable after an investigation and hearing and should therefore be required to set just and reasonable rates under subsection .410(a). While it is true that the Commission incidentally reviewed the rates for 1986–1996 in order to determine whether or not the rates for 1997–2000 were reasonable, it is a stretch to say that this incidental review was the type of "investigation and hearing" referred to in subsection .410(a). Subsection .410(a)'s use of the term "investigation and hearing" refers to a formal investigation and hearing concerning the rates for the years in question, not an investigation and hearing concerning rates for other years that incidentally address the time period in question. If we were to find otherwise, then the Carriers, who were not informed that the years 1986–1996 were on the table during the investigation of the 1997–2000 rates, would be deprived of an opportunity to present a full case as to those years.

Aside from their statutory argument, the Shippers provide no other support for the proposition that the Commission may not accept a settlement after it has initiated an investigation. The Commission provides a cogent statutory analysis and also relies on case law and its own regulations. These sources, as we explain below, provide additional support for the Commission's position.

The Commission cites two relevant regulations. First, 3 AAC 48.140(a) states that "[i]nformal conferences of the parties involved in an informal complaint or formal proceeding ... may be held at any time to provide opportunity for the settlement ... of any issues or problems relating to any manner whatever." Second, 3 AAC 48.090(d)(2) states that "[a]t any stage of the proceeding, prior to entry of the commission's final order ... the proceeding may be terminated by filing a stipulation agreed to by all parties of

record provided the commission does not find that the public interest requires the proceeding to be continued." Thus, the regulations promulgated by the Commission provide for settlement meetings and set out the standard under which the Commission will accept a settlement.

The Commission also relies on *Arctic Slope Regional Corp. v. Federal Energy Regulatory Commission*.[18] In *Arctic Slope* a corporation challenged the Interstate Settlement (under which TSM was used to calculate interstate rates).[19] The corporation's argument was similar to that of the Shippers: "once the agency has substantially completed an investigation, it is obliged to see the matter through to completion" and determine whether the rates were just and reasonable.[20] The D.C. Circuit looked to the Commission's rules governing settlements and noted that they were "quite broadly worded."[21] It found that "neither the statute nor the agency's corpus of rules requires the Commission under any and all circumstances to prescribe just and reasonable rates whenever a party requests that it do so, even after administrative proceedings have been underway for some considerable time."[22] While *Arctic Slope* relies on federal statutes and rules, its commonsense finding that FERC may accept a settlement even after a rate investigation has begun is persuasive.

The only related Alaska case, *Jager v. State*,[23] is not on point. That case dealt with a situation in which a residential customer, Jager, challenged natural gas rates as discriminatory.[24] "Based on the memoranda and exhibits submitted prior to the formal hearing, [the Commission's predecessor, the Public Utilities Commission] concluded that Jager had not established a prima facie case requiring an investigation of the entire rate structure."[25] This court disagreed and re-

---

**18.** 832 F.2d 158 (D.C.Cir.1987).

**19.** *Id.* at 163.

**20.** *Id.*

**21.** *Id.* at 164 (citing 18 C.F.R. § 385.602(h)(1)(ii)(B)).

**22.** *Id.* at 165.

**23.** 537 P.2d 1100 (Alaska 1975).

**24.** *Id.* at 1104.

**25.** *Id.* at 1105.

manded the case for further proceedings.[26] Nonetheless, the *Jager* opinion acknowledges the broad discretionary authority the Commission has over rate investigations:

> There is no "right" to have the commission act. The matter of rate discrimination and investigation is such that the commission must be free to weigh the charges and data presented and the costs to the public and utility, against which a complaint has been brought, to determine whether further proceedings are in the public interest.[27]

*Jager* does not address the question of whether the Commission can accept a settlement once an investigation has been initiated. Further, the situation in *Jager* cannot be likened to the situation at hand, because in *Jager* there was a pending complaint that had not been rejected on grounds of untimeliness. For these reasons, *Jager* is not helpful to the Shippers.

Finally, the Commission correctly argues that "Alaska law has long recognized 'the general policy of encouraging settlement of litigation. Stipulations and settlements are favored in law because they simplify, shorten, and settle litigation without taking up valuable court resources.' "[28] These concerns are no less compelling in a regulatory context than in the court system—they might even be more compelling given the highly technical and complex nature of many regulatory disputes and the significant resources required to resolve them.

For the reasons expressed above, we reject the Shippers' argument on the question under review.

## B. The Commission Had a Reasonable Basis for Denying as Untimely the Shippers' Challenge of the 1986–1996 Rates.

The Shippers also argue that the Commission erred by concluding in Order 68 that their 2003 petitions to intervene and protest

the 1986–1996 rates were untimely. As described above, the Commission decided to adjudicate the justness and reasonableness of the rates established by TSM in response to a rate protest by Petro Star in 1986. After Petro Star settled, the Commission accepted the Intrastate Settlement in 1993, but continued to suspend the post-July 11, 1986 rates solely for the purpose of determining whether they were correctly calculated pursuant to TSM. It still had not made this determination by late 1996, when the Shippers protested the 1997 rates. The Commission did not reach the question of whether the 1986–1996 rates were correctly calculated under TSM for some time after that, in part because it was dealing with the 1997 rate protest.

After the Commission had completed its investigation of the 1997–2000 rates and issued Order 151, it turned to the 1986–1996 rates and "scheduled a prehearing conference to be held on March 7, 2003, to determine whether any party still believed it necessary to verify TSM calculations and inputs for 1986–1996." Shortly before this hearing took place, Tesoro filed a protest and a petition to intervene. Williams intervened a couple of days later. After receiving briefing by Shippers, the State, and the Carriers, the Commission issued Order 68 in 2003.

In Order 68 the Commission noted that Tesoro and Williams wanted to "expand the present scope of Docket P–86–2 to hold a hearing and rule on the justness and reasonableness of the 1986–1996 intrastate TAPS rates." The Commission "decline[d] to expand the issues in [the] docket," because "fairness, and the reasonable reliance of the TAPS Carriers on [Order 41] require that [it] follow that order's clear intent."

In denying the Shippers' request, the Commission relied on its regulations regarding protests and petitions to intervene.[29] This court "review[s] an agency's interpretation of its own regulations under the reasonable and not arbitrary standard.... [This]

**26.** *Id.* at 1111.

**27.** *Id.* at 1106 (citation omitted).

**28.** Quoting *Interior Credit Bureau v. Bussing,* 559 P.2d 104, 106 (Alaska 1977) (citation omitted).

**29.** A protest occurs when an entity directly protests a rate filing by the carriers. A petition to intervene occurs when an entity tries to join in an existing rate protest. In 2003 Tesoro filed both a protest and a petition to intervene.

deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation at issue." [30] We will uphold the Commission's decision in Order 68 to deny the Shippers' challenge to the 1986–1996 rates as untimely if the Commission had a reasonable basis for making it. A reasonable basis is established if the Commission's decision is "supported by the evidence in the record as a whole." [31]

With respect to the petition to intervene, the Commission denied it on the basis of 3 AAC 48.110(b) and (d). Subsection (b) of AAC 48.110 states that "[i]n passing on a petition to intervene" the Commission should consider "the extent to which participation of the petitioner will broaden the issue or delay the proceeding." [32] Subsection (d) of 3 AAC 48.110 states that "a petition for permission to intervene must be filed with the commission before the first prehearing conference.... A petition for permission to intervene which is not timely filed will be dismissed unless the petitioner clearly shows good cause for failure to file that petition on time."

With respect to the rate protests before it, the Commission relied on 3 AAC 48.290(a). This regulation states that

> [a]ny person desiring to submit a statement of interest in, or objection to, a tariff filing may be asked to do so not later than 20 days after the date of delivery to the commission unless a longer period, not in excess of 30 days, is granted by public notice or by notice in writing.

In Order 68, the Commission found that the Shippers' petitions to intervene were untimely under 3 AAC 48.110(d) and also should be denied under 3 AAC 48.110(b) since, if granted, they would have improperly

broadened the scope of the proceedings. The Commission also found that the Shippers protests were untimely under 3 AAC 48.290(a). As is discussed below, the Commission had a reasonable basis for these holdings.

### 1. The Shippers did not timely challenge the 1986–1993 rates.

After the State and the Carriers submitted the Intrastate Settlement to the Commission in 1986, the Commission issued Order 14. Order 14 approved the portion of the Settlement dealing with the time period prior to July 11, 1986. Since Petro Star protested the rates established by TSM as unjust and unreasonable on July 11, 1986, the Commission noted that "there is no consent of the directly affected entities after that date." Order 14 therefore held that the Commission was "required to determine just and reasonable rates for periods after that date." This rate investigation extended through 1991, at which time Petro Star and the Carriers submitted a settlement agreement for approval by the Commission. In 1993 the Commission issued Order 41, which accepted both the Petro Star Settlement and the Intrastate Settlement.[33]

The Shippers did not petition to intervene in the Petro Star protest on the issue of whether the rates were just and reasonable until 2003. Under 3 AAC 48.110(d), the Shippers should have intervened before the first prehearing conference, which was held in January 1987.[34] The Shippers argue that it is unfair to require them "to intervene in 1987 in order to have an opportunity to be heard on the TAPS Carriers' rate filings in 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, and 1996." This mischaracterizes the rule. The Shippers had to intervene before the

---

30. *Stosh's I/M v. Fairbanks N. Star Borough,* 12 P.3d 1180, 1183 (Alaska 2000) (citation and quotation omitted).

31. *Cook Inlet Pipe Line Co. v. Alaska Pub. Utils. Comm'n,* 836 P.2d 343, 348 (Alaska 1992) (quotation omitted).

32. 3 AAC 48.110(b)(7).

33. The Commission suspended 1986 rates after July 11, 1986, and continued to suspend them up until it issued Order 41 in 1993. Order 41

therefore covered rates for all of the years from 1986–1993.

34. The Shippers argue that they filed a timely petition to intervene because a prehearing conference was held on March 6, 2003. But 3 AAC 48.110(d) requires a petition to intervene to be filed "before the *first* prehearing conference." (Emphasis added.) The first conference was the 1987 conference, not the 2003 conference.

January 27, 1987 prehearing conference in order to intervene in Petro Star's protest of the 1987 rates. Subsection (d) of 3 AAC 48.110 requires a showing of good cause if they were to protest after that date. Once the rate investigation continued past the first year, the Shippers might still have had good cause to intervene as to prospective years.

Alternatively, the Shippers could have timely protested each temporary rate that was filed. The Commission suspended the rates filed every year between 1987 and 1993, noting that they were under investigation as just and reasonable, and if they were found to be appropriate, the Commission would determine if they were correctly calculated under TSM. These rate filings were published along with a deadline for filing protests. Nothing stopped the Shippers from timely protesting prospective rates as they were filed. The key point is that they did nothing. No petitions to intervene or protests were filed as to the justness and reasonableness of the rates until 2003.

By failing to intervene in Petro Star's protest as to whether the rates from 1986–1993 were reasonable, the Shippers gained an advantage. They did not have to pay for costly rate litigation but would have nonetheless reaped the benefits of any success Petro Star may have had in lowering the rates. At the same time they ran a risk that Petro Star would settle. The interests of justice and fairness are not served by permitting the Shippers to wait on the sidelines for years and only attempt to intervene as to the past rates when Petro Star tried to settle. Had the Shippers filed a petition to intervene between 1991 and 1993 [35] with respect to the 1986–1993 rates, the Commission might very well have had a reasonable basis for denying the petition as untimely.[36] But the Shippers waited another ten years before trying to intervene. They have shown no good cause for waiting until 2003,[37] and we therefore uphold the Commission's determination that the petition to intervene was untimely under 3 AAC 48.110(d).[38]

Subsection (b) of 3 AAC 48.110 provides a separate ground for denying the Shippers' petitions to intervene. It states that the Commission will consider "the extent to which participation of the petitioner will broaden the issue." [39] As is discussed below, Order 41 accepted the Intrastate Settlement and continued to suspend the filed rates for the limited purpose of determining whether they were correctly calculated under TSM. If the Commission had accepted the petition to

---

35. The time period from 1991 to 1993 corresponds with the time period between Petro Star and the Carriers submitting the settlement agreement to the Commission for approval and the Commission accepting the agreement in Order 41.

36. In fact, in 1991 Williams (then MAPCO) unsuccessfully tried to intervene in Petro Star's protest of the corrosion costs. In explaining its denial of the intervention attempt, the Commission noted the following:

> The existence of Petro Star's challenge of TAPS rates on three fronts created in other shippers, including MAPCO, an expectancy that, if Petro Star were successful on any of those fronts, they would receive a reduction in rates identical to that received by Petro Star. In order for that expectancy to come to fruition, it was necessary for Petro Star to engage in expensive and complicated litigation in which other shippers were not participating and for which they were not paying (except through funding legal expenses of the TAPS Carriers under TSM).
>
> Petro Star could have, unilaterally, for any reason, withdrawn from some or all of this litigation. It was under no obligation to any-

one, other shippers included, to continue the litigation.

37. Williams argued that it did not intervene earlier in the proceedings because it only learned that certain projections in the 1986 settlement offer provided by the TAPS Carriers were incorrect during hearings on Docket P–97–4. We agree with the Commission that Williams's allegations did not provide clear evidence of misleading information. In addition, Williams chose to file pleadings in support of the settlement agreement in order to expedite payment to itself of intrastate refunds without first conducting an investigation of the settlement. Williams does not explain why this business decision should provide it with a good cause excuse for its failure to confirm the information provided to it by the TAPS Carriers and the State of Alaska.

38. Tesoro also argues that it did timely petition to intervene since it had "six pending, unopposed petitions to intervene before the prehearing conference in 1987." However, Tesoro withdrew those petitions pursuant to an agreement with the Carriers.

39. 3 AAC 48.110(b)(7).

intervene as to the issue of whether the rates were just and reasonable, it would have significantly broadened the issues before it. Therefore the Commission had a reasonable basis for denying the petition based on 3 AAC 48.110(b) as well.

■ In 2003 the Shippers also separately protested the 1986–1993 rates as unjust and unreasonable. This protest of the 1986–1993 rates was untimely under 3 AAC 48.290(a). The Commission published notice of temporary rates filed during that time and deadlines for objections. The Shippers did not protest any of the rates. The rates were suspended because of the pending rate investigation, but there is nothing in 3 AAC 48.290(a) to suggest that there is no deadline for protesting suspended rates. Subsection (a) of 3 AAC 48.290 states that the deadline applies to "a tariff filing" not just to "permanent tariff filings." To find that the timeliness requirement did not apply to suspended rates would be problematic, since any time one entity protested rates in any way, another entity would be able to protest any facet of the rates at any time.

The Shippers argue that 3 AAC 48.290(a) does not govern, and instead the Commission's regulations allow "protests . . . to be filed at any time." They argue that "3 AAC 48.130(a)(4) only requires that a protest comply with 3 AAC 48.090–3 AAC 48.100." According to the Shippers, 3 AAC 48.290(a) only addresses "the manner in which a member of the public should respond to a public notice of a filing."

This argument has no merit. Part 7 of Title 3 of the Alaska Administrative Code covers the Commission. Chapter 48 deals with the Commission's practices and procedures. Part 1 of Chapter 48, which contains 3 AAC 48.090–100 and 3 AAC 48.130, outlines "practice before the Commission." These provisions are not limited to Pipeline proceedings and therefore cover procedural requirements for all of the entities regulated by the Commission. The provisions set out detailed technical requirements for formal complaints filed before the Commission.

The Shippers argue that because Part 1 of Chapter 48 contains no timeliness requirement, none exists. However, as the Commission notes, "[t]he requirement that a protest adhere to formal and technical pleading requirements does not support the conclusion that timeliness requirements . . . established in other relevant regulations do not apply." Part 2 of Chapter 48 expressly deals with "Utility and Pipeline Tariffs." This part contains 3 AAC 48.290(a), which states that the Commission may impose deadlines for protests. The Commission's interpretation that this regulation covers protests by parties is reasonable and one to which we defer.

In summary, the Commission's regulations provide it with a reasonable basis for denying as untimely the Shippers' petitions to intervene and protests of the 1986–1993 rates. The Shippers did not timely petition to intervene in Petro Star's protest. They did not protest any of the suspended rates filed during that time period. They did not petition to intervene as to the justness and reasonableness of the rates for any additional years . after 1987. Order 41 clearly set out the need to protest and the fact that, absent a protest, the Commission was going to accept the Settlement and rates correctly calculated under TSM. When Order 41 came out in 1993 the Shippers still did not protest the 1986–1993 rates. Instead they waited almost a decade before they tried to challenge the rates based on justness and reasonableness. They have shown no good cause for such a delay. Accordingly, we uphold the Commission's finding.

2. **The Shippers did not timely challenge the 1994–1996 rates.**

Order 41 put the Shippers on notice that they needed to protest future rate filings in order to ensure that the rates would be investigated. Order 41 noted that Petro Star was the only "economically impacted party which requested the establishment of just and reasonable rates" and that after Petro Star withdrew from the docket due to its settlement there would "no longer be an economically impacted party contesting the [Intrastate] settlement." It also noted that under 3 AAC 48.090(d)(2) the Commission could terminate the proceeding prior to issuing a final order if a stipulation is filed, which

**1170**

is "agreed to by all parties of record provided the commission does not find that the public interest requires the proceeding to be continued." It relied on Order 14 to "interpret[ ] the phrase 'all parties of record' to include only economically impacted parties," and then held the following:

> Under the standard articulated in [Order 14] the directly affected entities (which were deemed by the Commission to be knowledgeable and sophisticated and in possession of sufficient resources to make their views known to the Commission and which had notice and an opportunity to be heard) must either actively support the settlement or be silent on the issue. TSM rates have been calculated and filed for six years since the Commission's acceptance of past rates in [Order 14]. In that time no economically impacted entity has protested those rates....

The Commission also noted that its own staff and the Alaska Public Interest Research Group still opposed the Settlement, but found the following:

> Those parties have not demonstrated any plausible reason why the Commission should mandate litigation of rates which are being charged by the Carriers without protest by any ratepayer or other economically impacted entity. Entities impacted by oil pipeline rates are sophisticated and capable financially and practically of protecting their own interests. Not one has come forward to contest the TAPS Settlement. Under these circumstances, the public interest does not require that this proceeding be continued. The TAPS Settlement should be accepted, subject to the condition that Petro Star file a notice of withdrawal in Docket P–86–2.

Thus, based on the fact that there were no pending protests filed by economically impacted entities, Order 41 accepted the TAPS Settlement and specified that the TAPS Carriers were "under an obligation to file TAPS rates no higher than the maximum tariffs calculated under TSM." The emphasis on the fact that the Commission only accepted the Settlement because no economically impacted

entity contested it gave the Shippers notice that they had to protest a Settlement rate before it would be investigated.

The complicating factor is that Order 41 held that the suspension of the TSM rates filed between 1986 and 1993 would not be vacated until the Commission determined "that those filed rates were correctly calculated under TSM." [40] The Shippers argue that the rates for 1986–1996 were not final because they were still suspended. Therefore, according to the Shippers, they were not required to object to the rates in a timely manner.

■ This argument is unpersuasive. Order 41 is clear that it accepted the Settlement and only suspended the rates for the limited purpose of determining whether they were calculated correctly under the TSM methodology established by the Settlement. Order 41 also makes it clear that the Shippers would have to protest future rates in a timely manner in order to obtain an adjudication of the question of whether the rates were just and reasonable, as opposed to the question of whether they were correctly calculated under TSM. It states that "[e]ach new rate filed by the TAPS Carriers under the Intrastate Settlement Agreement is considered a revised tariff filing under AS 42.06.400." Alaska Statute 42.06.400(a) governs the suspension of tariff filings. It states that "[w]hen a tariff filing is made containing an initial or revised rate ... the commission may, *either upon written complaint* or upon its own motion, after reasonable notice, conduct a hearing to determine the reasonableness and propriety of the filing." (Emphasis added.) Subsection .400(a) then goes on to discuss the process for suspending the operation of a tariff "[p]ending a hearing." By referring to this statute, Order 41 put the Shippers on notice that they must protest a rate to ensure an adjudication of its reasonableness.

Order 41 also stated that each new rate filed by the Shippers "is subject to the same standards and procedures to which it would have been subject if the Intrastate Settle-

---

40. Between 1993 and 1996 the Commission continued to suspend rates solely for the purpose of determining whether they were correctly calculated under TSM.

ment Agreement had not been accepted." As discussed above, one of the regulations governing the filing of a new rate is 3 AAC 48.290(a), which enables the Commission to set a deadline for objecting to rates. The Commission provided public notice and notice to the Shippers of the Carriers' rate filings for 1994, 1995, and 1996, and this notice included a deadline for objections.

Therefore, even though the Commission stated that it was going to suspend the rates in order to review them for compliance with the Settlement, Order 41 gave clear notice that this review would not include a determination of whether the rates were just and reasonable. The Shippers were informed that each rate filing after 1993 would be considered a revised tariff filing under AS 42.06.400, which would enable them to object to it. They were also told that each filing would be subject to any standards and procedures that it would have been subject to if the Settlement had not been approved. This information put them on notice that the Commission could set a deadline for protests under 3 AAC 48.290(a). Then, as required by 3 AAC 48.290(a), each time the Carriers filed a rate the Commission gave the Shippers notice of the rate and specified a deadline for comments and petitions. It is highly unlikely that the Shippers could have misunderstood the requirement that they object to the rates in a timely manner in order to ensure that the Commission would adjudicate the question of whether the rates were just and reasonable. In fact, in 1996 they did timely protest that the 1997 rates were unjust and unreasonable. As the Commission points out, "Tesoro's timely protest of the 1997 rates confirms that Tesoro was fully aware of the requirement of filing a timely protest in order to challenge TSM rates on grounds other than whether they were correctly calculated under TSM." We agree, and thus uphold the Commission's decision that the Shippers' challenge to the 1994–1996 rates was untimely.

**3. Concerns similar to those underlying the rule against retroactive ratemaking provide additional support for the Commission's decision.**

In Order 68, the Commission found that:

[Order 41] is not a procedural order. In that order [the Commission] found that TSM was an acceptable method to calculate intrastate rates for 1986 to 1996. It accepted the filed rates subject to verification that they were correctly calculated. Shippers had the right to challenge any rate calculated under TSM. The particular shippers who now challenge the rates have had full knowledge of TSM, the methodology used to calculate their rates, and all its provisions, during the entire period at issue.... Fairness and confidence in the regulatory process both require that we not disturb [Order 41] without good cause.

This reasoning alludes to prudential concerns. In its brief, the Commission points to the rationale underlying the rule against retroactive ratemaking as support for its finding. As we pointed out in *Matanuska Electric Ass'n v. Chugach Electric Ass'n*, "[a] fundamental rule of ratemaking is that rates are exclusively prospective in nature." [41] This "rule is critical for a utility to plan its finances. Other purposes for prohibiting retroactive rates include investor confidence, utility credit rating, and the integrity of service. And retroactivity, even where permissible, is not favored, except upon the clearest mandate." [42] These concerns provide policy support for Order 68.

The Commission's regulations and orders clearly communicated the need to protest rates and the deadlines for protests and petitions to intervene. The Shippers have provided no good reason for why they waited until 2003 to protest the rates. Based on the analysis above, the Commission had a reasonable basis for denying the Shippers' protests and petitions to intervene between 1986 and 1996. [43] We therefore uphold Order 68.

---

**41.** 53 P.3d 578, 583 (Alaska 2002) (quotations omitted).

**42.** *Id.* (quotations and citations omitted).

**43.** The Shippers' due process claim is rejected for the same reason that Order 68 is upheld. As described in the analysis above, the Shippers had notice and an opportunity to be heard.

## C. The Shippers' Other Arguments Are Unpersuasive.

The Shippers make several other arguments which we deal with briefly below.

The Shippers argue that AS 42.06.400(b) requires the Commission to hold a hearing and complete its investigation prior to vacating an order suspending rates. Subsection .400(b) states that:

> An order suspending a tariff filing may be vacated if, after investigation, the commission finds that it is in all respects proper. Otherwise the commission shall hold a hearing on the suspended filing and issue its order, before the end of the suspension hearing, granting, denying or modifying the suspended tariff in whole or in part.

The Shippers argue that because there was no investigation, there could be no finding that the rates were proper. They argue that "this Court should reverse and remand this decision on this point alone." However, there is nothing in the statute suggesting that the Commission cannot, pursuant to its investigation, find a rate to be "in all respects proper" because it is made under a settlement approved by the Commission. As with the arguments discussed in Section A above, to find otherwise would mean that the Commission could never accept a settlement without first adjudicating rates.

The Shippers also argue that "[t]he Commission wrongfully concluded that Williams and Tesoro were not parties in Docket P–86–2." However, the Commission did not base its finding on the party status of the Shippers. Rather it relied upon the untimeliness of their requests.

 The Shippers emphasize the fact that "all rates for 1986–1996 were protested by one or more interested parties." However, they do not point to a single instance in which they protested a rate between 1986–1996. They cannot rely on the fact that other parties, such as the Commission staff, Petro Star, or the Alaska Public Interest Research Group, protested the rates.[44] They did not invest the significant costs involved in undertaking rate litigation. While they might hope that the efforts of others will be successful, they cannot initiate an investigation years after the other efforts fail on the basis that they did not have to timely protest because others did.

 The Shippers also suggest in passing that the Commission erred by accepting the filed rates without determining whether they were correctly calculated under TSM. The Commission scheduled a prehearing conference in Docket P–82–2 for March 6, 2003, to determine whether any party still believed it necessary to verify TSM calculations and inputs. In the days immediately prior to the hearing, the Shippers filed their protests and petitions to intervene. These filings did not protest that the rates were not calculated in compliance with TSM. The Shippers were on notice that the rates were going to be approved if no party requested a formal verification of the TSM calculations and inputs,

---

44. The Shippers also point to the fact that "in Order 14, the Commission declared that the Commission Staff was an 'appropriate and independent competent party to protest all present and prospective rates on behalf of the future shipping public....' " They argue that "the Commission abruptly changed course" in Order 41 when it held that the staff's protests were not sufficient to stop it from accepting the Settlement because the staff was not an economically impacted party.

There are two problems with this argument. First, the Commission did not change course. In Order 14 the Commission accepted the Settlement over the opposition of some parties because "those parties have not presented sufficient argument or evidence to convince the Commission that acceptance of the settlement rates ... is contrary to the public interest." Similarly, in Order 41 the Commission accepted the Settlement as applied to rates after July 10, 1986, over the arguments of its staff, explicitly comparing its action with the decision it made in Order 14. The Commission stated that the opposing parties "have not demonstrated any plausible reason why the Commission should mandate litigation of rates ... without protest by any ratepayer.... Under these circumstances the public interest does not require that this proceeding be continued." The Commission never stated that it was bound to continue rate litigation based on the objection of its staff if the Commission determined that doing so was not in the public interest.

Second, as with many of the Shippers' arguments concerning Order 41, even if it did have merit it does not explain why they did not protest the rates for the years after 1993, when Order 41 was issued, until 2003.

but they did not request this verification. On May 6, 2003, the Commission gave notice that it was going to deny the Shippers' protests and petitions to intervene, and on June 23, 2003, the Commission issued Order 68 stating its decisions and more fully explaining them. This order also stated that it approved "the unchallenged intrastate TAPS rates [for 1986–1996] as permanent rates." The rates were then formally established in a subsequent order.[45] Because the Shippers did not express an interest in verifying TSM calculations and inputs in their filings and they had notice that the rates would be established as final if no one requested verification of the TSM calculations and inputs, the Commission was within the bounds of its discretion when it decided not to conduct a further investigation of whether the 1986–1996 rates complied with TSM and approved them as permanent rates in Order 68.

Finally, the Shippers argue that "the Commission failed to resolve crucial regulatory issues that could lead to inconsistent results." However, these arguments miss the basic point: the Commission accepted the rates pursuant to a Settlement. The rates therefore do not need to be consistent with the rates that were determined as a result of adjudication following a timely protest.

## V. CONCLUSION

The Shippers claim that the Commission must complete every rate investigation that it initiates and therefore has no ability to accept a settlement. This claim has no support in the statutes, case law, or regulations. We decline to reverse Order 68 on the basis of this argument.

The Shippers' claim that their petitions to intervene and protest were timely is also unpersuasive. Tesoro and Williams (then MAPCO) could have timely petitioned to intervene in Petro Star's protest in 1987. They could have protested the temporary rates filed between 1986 and 1993. They could have tried to intervene in Petro Star's case any time between 1986 and 1991, when Petro Star and the Carriers submitted a Settlement to the Commission for approval.

They could have tried to intervene after Petro Star submitted the Petro Star Settlement and before the Commission approved it in Order 41, which was issued in 1993. They could have submitted a motion to reconsider Order 41. They could have objected to the 1986–1993 rates in response to Order 41. They could have timely protested the 1994–1996 rates after they were sent notices of rates filings containing deadlines for protesting. They even could have tried to object to the 1986–1996 rates when they timely protested the 1997 rates. They did none of these things. A review of the record as a whole shows that the Shippers had ample notice and opportunity to protest the rates but failed to do so. The Commission had a reasonable basis for denying their 2003 protests as untimely.

Accordingly, we REVERSE the order of the superior court of June 7, 2006, and REMAND this case with instructions to affirm Commission Order 68.

BRYNER, Justice, not participating.

---

**45.** *In re Amerada Hess Pipeline Corp.*, Order P–86–002(69) (Regulatory Comm'n of Alaska Feb. 9, 2004), *available at* http://www.state.ak.us/rca/orders/pipeline/1996/p86002_69.pdf.